RICHMOND & I. CONST. CO. v. RICHMOND, N., I. & B. R. CO. et al.

(Circuit Court of Appeals, Sixth Circuit. May 7, 1895.)

Nos. 231, 236–239, 241–246.

1. CORPORATIONS—IDENTITY OF STOCKHOLDERS.

The fact that the stockholders in two corporations are the same, or that one corporation exercises a control over the other, through ownership of its stock, or through the identity of the stockholders, such corporations being separately organized under distinct charters, does not make either the agent of the other, nor merge them into one, so as to make a contract of one corporation binding upon the other.

2. MECHANICS' LIENS—KENTUCKY STATUTE—EFFECT OF APPROVAL OF SUBCONTRACT BY OWNER.

The R. Ry. Co. made a contract with the O. Contract Co. to build its road. Before the completion of the work, the contract company, through exhaustion of its resources, became unable to continue it and thereupon made a contract with the R. Construction Co. to complete the work. The railway company was informed of such contract, and its board of directors passed a resolution consenting thereto, and consenting, so far as it could lawfully do so, that the construction company should have a contractor's lien upon the railroad for all work done. *Held,* that such resolution did not make the construction company a principal contractor with the railway company, nor give rise to a principal contractor's lien under the Kentucky statute (Barb. & C. Ky. St. 1894, §§ 2492–2495), but, at most, created a lien by contract, which could not be superior to mortgages or liens arising by statute.

3. SAME—APPLICATION OF PAYMENT TO SUBCONTRACTOR.

The contract between the contract company and the construction company for the completion of the railroad provided for the doing of a variety of things, some of which were, and some were not, proper subjects of liens against the property of the railway company; and such contract, together with a modification thereof subsequently agreed upon, provided that the construction company should be paid by the contract company the amount of money it expended in doing such things, and an equal amount of bonds of the railway company, which, at the time of the contract, were worth about 40 cents on the dollar. *Held,* that any hardness in the bargain between the principal and subcontractor not amount-

ing to fraud upon other lienors or the railway company was not a reason for applying to payments made by the principal to the subcontractor any different rule from that prevailing in other cases of such payments, and that the bond payments, applicable to the lienable part of the construction company's claim, the money payment not having been made, and, being only obtainable through a lien on the railroad, should be applied primarily to that part of such claim in excess of what could be obtained by lien. Central Trust Co. v. Richmond, N., I. & B. R. Co., 68 Fed. 90, followed.

4. SAME—LIENABLE CLAIMS.

*Held*, further, that the construction company was not entitled to claim a lien, under such Kentucky statute, for money expended either for purchase of rights of way for the railroad, or for payment of salaries of its officers, or for stationery and office expenses, or for a commission to a trust company for guarantying a contract for the purchase of rails, such guaranty being made necessary by the construction company's lack of funds and credit, or for legal expenses in purchasing and condemning rights of way, rights of way not being material and legal services not being labor, within the meaning of the lien act.

5. SAME—CONTRACT PRICE.

The original contract between the railway company and the contract company included an agreement by the latter to pay the interest on the bonds of the former during construction, and for a year after. *Held* that, in estimating the gross contract price for the building of the railroad, such interest was properly deducted from the whole amount to be paid.

6. SAME—INTEREST—LIENS OF DIFFERENT PRIORITIES.

*Held*, further, the amounts due from the contract company to its various subcontractors having been due at the completion of the work, except in the case of the construction company, whose payment was due at a fixed date after the completion of the work, that such subcontractors were entitled, as against the contract company, to interest from the completion of the work, and, in the case of the construction company, from such fixed date, and that such interest was also properly allowable as against mortgage bondholders whose lien was by statute made subsequent to the liens for labor and material furnished.

7. SAME—MATERIAL LOST BY NEGLIGENCE.

One W., a subcontractor under the contract company for the construction of a bridge, claimed a lien for material lost by the fall of a part of such bridge during construction. His contract provided that the material for the bridge, as delivered and paid for, should become the property of the contract company. It did not appear that the material had been paid for, but it did appear that the loss was due to W.'s own negligence. *Held*, that he was not entitled to a lien.

8. SAME—PLACE OF FILING LIEN.

The statute provided that the statement claiming a lien should be filed in each county in which the labor was performed. One D. filed a lien for services as engineer in J. county. It appeared that his work had been principally in J. county, but that he did a small amount of work in W. county. *Held*, that he should be allowed a lien for two-thirds of the amount of his claim.

9. SAME—MATERIAL NOT DELIVERED.

D. & C. prepared a quantity of railroad ties under a contract with the contract company. That company notified D. & C. that it would not accept the ties, and they were never delivered. *Held*, that D. & C. were not entitled to a lien.

Appeal from the Circuit Court of the United States for the District of Kentucky.

These were appeals in the suit of Central Trust Co. v. Richmond, N., I. & B. R. Co., 68 Fed. 90, severally taken by the Richmond & Irvine Construction Co., L. F. Mann, J. E. Dougherty, G. W. Gourley,

W. B. Smith, D. Shannahan & Co., J. W. Walker and others, John Mitchell & Co., M. A. Sullivan, Dickason & Crawford, and John McLeod, from the decree of the circuit court settling the priorities among the various claimants of the fund arising from the sale of the railroad.

Each of the appellants named above has prosecuted a separate appeal. The general facts out of which the questions presented by them arise have been stated in the opinion filed upon the appeal of Central Trust Co. v. Richmond, N., I. & B. R. Co. (being No. 240 on this docket) 68 Fed. 90. These general facts need not be again stated. Many of the questions arising upon the separate assignments of error filed by the several appellants are fully covered by the opinion in the case above referred to. The court, in this opinion, will confine itself to such questions as were not necessarily involved in the former case.

A. E. Richards and J. B. Baskin, for Central Trust Co.
W. A. Sudduth and H. L. Stone, for Richmond Const. Co.
Earnest Macpherson, for John Mitchell & Co.
St. John Boyle, for Louisville Trust Co.
Matthew O'Doherty, for D. Shannahan & Co.
Humphrey & Davie, for D. Shannahan & Co. and J. W. Walker.
Pirtle & Trabue, for Dickason & Crawford.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

LURTON, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

1. One of the principal questions presented by the appeal of the Richmond & Irvine Construction Company concerns the relation which it bears to the appellee the Richmond, Nicholasville, Irvine & Beattyville Railroad Company. Its contention is that it is properly to be considered as a contractor with the railroad company, and it assigns as error that the circuit court did not so hold, instead of construing it to be a subcontractor under the Ohio Valley Improvement & Contract Company. As will appear more fully by the opinion of the court heretofore filed in the case of Central Trust Co. v. Richmond, N., I. & B. R. Co., 68 Fed. 90, the Ohio Valley Improvement & Contract Company had contracted with the said railroad company to construct and equip the entire line of railroad of the said railroad company. The Ohio Valley Improvement & Contract Company, hereafter designated as the "Contract Company," after doing the larger part of the work and furnishing the greater part of the materials for that purpose, became financially embarrassed, and unable to complete its contract without assistance. It had agreed to construct and equip the said line of railroad for the bonds and stocks of the railroad company. Thus all the assets of the railroad company had either been paid or pledged to it, and when the latter became unable to go on with the work the railroad company was in no condition, financially, to complete the construction itself. In this situation of affairs the contract company entered into an agreement with the appellant the Richmond & Irvine Construction Company, hereafter designated the "Construction Company," that the latter should complete the work of construction between Richmond and Irvine, Ky., and furnish all necessary materials. It also agreed to purchase

and hold certain coupons detached from the bonds of the railroad company, which coupons the contract company, under its agreement with the railroad company, was under obligation to pay, and to purchase and hold certain subcontractors' lien claims due by the contract company. The agreement between the construction company and contract company provided that the former should have a "subcontractors' lien" on the property of the railroad company. The subscribed capital stock of the construction company was estimated to be $200,000. It contracted to do work and furnish materials of an estimated value of not more than $140,000, and to expend the balance of its subscribed capital stock in the purchase of the coupons and subcontractors' liens designated by the contract. The contract concluded in the following words:

"And said contract company agrees to pay the said construction company for said work, materials, and such claims as may be so purchased, the sum $400,000, to be paid as follows: In the new 5 per cent. first mortgage bonds of said railroad company the sum of $200,000 as soon as the bonds are printed and ready for delivery, and the sum of $200,000 in money due and payable at the expiration of thirty days after the track of said railroad is laid and completed as aforesaid from Richmond, Ky., to the Kentucky river, opposite Irvine, Ky.; but, should said sum not be paid at maturity, the same shall bear no interest until January 1, 1892."

It was signed only by the contract company and the construction company. The contention of appellants that this contract is to be construed as a contract of the railroad company, and its relation as that of an original contractor, is based upon two propositions:

First. It contends that under the evidence in this case the contract company was, in legal effect, the railroad company, and that engagements made by it were, in legal effect, engagements made by the railroad company. In support of this, appellant has endeavored to show that the stockholders in each corporation were the same, and that the contract company dominated and controlled the railroad company. The contract company was a legal corporation, wholly distinct and separate from the railroad company. The fact that the stockholders in each may have been the same persons does not operate to destroy the legal identity of either corporation. Neither does the fact that the one corporation exercised a controlling influence over the other through the ownership of its stock or through the identity of stockholders, operate to make either the agent of the other, or to merge the two corporations into one. There is no pretense of any fraudulent concealment of the interest of the one corporation in the other, or of the fact that the persons controlling the one corporation likewise controlled the other. The officers and agents of the construction company were fully aware of the relations which existed between the two companies. They also knew that the contract company was under obligation to build and equip the railroad for the railroad company. With this knowledge of the relations of each corporation to the other, it deliberately entered into a contract with the contract company to do work for and under the contract company, as a subcontractor. The facts of this case are very much the facts which appeared in the case of Trust Co. v. Bridges, 6 C. C. A. 539, 57 Fed. 753. In that case the court dis-

tinctly held, on substantially the same facts, that the corporations were to be treated as distinct entities, and that neither was to be treated as the agent of the other, when openly contracting for itself, and in its own corporate name.

Second. Appellant also rests its contention upon the legal effect of the action of the board of directors of the railroad company contained in certain resolutions found upon the minutes of the board, as follows:

"Whereas, the Richmond, Nicholasville, Irvine & Beattyville Railroad Company, hereinafter designated the 'Railroad Company,' is informed by the Ohio Valley Improvement & Contract Company, hereinafter designated the 'Improvement Company,' that it desires to make a subcontract with the Richmond & Irvine Construction Company, hereinafter designated the 'Construction Company,' substantially as follows, to wit: First. That said construction company will finish the work of construction necessary to be done upon the railroad of the railroad company from Versailles to Irvine, according to the construction contract of October 11, 1888, which, it is estimated, will require something less than $140,000. Second. That said construction company shall purchase and take up certain lien claims of subcontractors, now existing and unpaid, for work heretofore done and material furnished on the line of the railroad, the lien claims to be purchased, added to the cost of the work and materials, to aggregate $200,000. Third. That said improvement company will pay to said construction company, in money, the amount so paid out both in construction and in the purchase of subcontractor's lien claims, amounting in the aggregate to $200,000, and will pay to the said construction company, as an additional consideration, in 5 per cent. bonds of this company, an amount equal, at par value, to the amount of money to be so paid by the improvement company to the construction company. Now, be it resolved, that the Richmond, Nicholasville, Irvine & Beattyville Railroad Company does hereby consent to the subletting by said improvement company to said construction company upon substantially the terms above mentioned, and consents, so far as this company can lawfully do so, that said construction company shall have a contractor's lien upon the railroad for all work done and material furnished and claims purchased as above mentioned."

These resolutions do not operate to make the railroad company a principal contractor, within the meaning of the Kentucky lien act, being sections 2492–2495, St. Ky. 1894, by Barbour and Carroll, and which have been fully set out in the opinion of this court filed in the principal case. A contractor, within the meaning of that act, is one who does work or furnishes material for the owner, and upon a contract with the owner for the payment of the contract price. A subcontractor, within the meaning of that act, is one who contracts under and with the principal contractor. Now, nothing in these resolutions obligated the railroad company to pay the construction company for the work and materials which it was to do and furnish, and for the lien claims which it was to purchase and hold. The railroad company was obligated to the contract company to the extent of the contract price mentioned in the contract between them. The labor and materials which the construction company undertook to furnish are a part of the same labor and materials which the contract company had agreed to furnish, and for which the railroad company was bound to pay. There is nothing in these resolutions which indicates that the railroad company intended to personally assume liability to the construction company. The language that "it consents, so far as this company can lawfully do so, that said construction company

shall have a contractor's lien upon the railroad for work done and material furnished and claims purchased," implies simply a lien by contract. A contractor's lien, per se, is one that arises by operation of law, independently of the express terms of any contract. It springs out of the obligation to pay for the stipulated labor and the promised materials, when furnished, provided the contractor shall give the notice required by statute. McMurray v. Brown, 91 U. S. 266. This, at most, is an agreement for a lien by contract. No lien dependent upon a contract for a lien would be effectual as against mortgages, or the liens of contractors or subcontractors created by the lien statute. We agree with the holding of the circuit court that the relations which existed between the Richmond & Irvine Construction Company and the railroad company was not that of contractor and owner, but of subcontractor and owner.

2. The nineteenth assignment of error filed by the construction company presents a question concerning the application of a payment of part of the contract price in railroad bonds, made by the contract company to the construction company. The rule in regard to partial payments made by the contract company to its subcontractors, and the effect of such payments upon the lien of such subcontractors, is fully stated and explained in the opinion filed upon the questions involved by the appeal of the Central Trust Company, and need not be here repeated. That rule was applied to all payments made to subcontractors, except only the construction company. The learned district judge who heard this case in the circuit court deemed the contract between the contract company and the construction company so peculiar as to justify a departure from the general rule adopted with reference to partial payments made to other subcontractors by the contract company. The peculiarity of that contract consisted, not only in the great variety of things which the construction company undertook to do, but in the odd way in which the price was to be fixed which was to be paid for all its undertakings. The construction company was a corporation organized for the express purpose of helping the contract company out of its difficulties. It obligated itself to do all that the contract company had contracted to do, and had not done, on that part of the road between Richmond and Irvine, Ky. This involved the acquirement of rights of way, grading, track laying, bridge and depot building, the furnishing of all necessary materials, including steel rails, etc. The contract company had, as more fully appears in the principal opinion, obligated itself to pay the interest upon the bonds of the railroad company during construction, and for one year thereafter. It owed a great deal of money to subcontractors for work finished and materials furnished. Its obligation to pay matured coupons, and to pay subcontractors having liens, had to be provided for, and so the construction company undertook to buy and hold matured coupons not exceeding $12,000 in par value, and to purchase and hold for its benefit subcontractors' lien claims to be designated by the contract company. The total capital stock of the construction company was fixed at $200,000. Of this capital it undertook to use $140,000 in expenditures on the work of construction. The expendi-

tures upon this account, it was provided, should include "the actual cost and expenditures" on account of labor done, materials furnished, and rights of way acquired, "including the salaries of said construction company's officers and agents." The remainder of its capital, estimated at $40,000, was to be expended in the purchase of matured coupons and lien claims. Thus it was contemplated that the construction company should actually expend $200,000 for the benefit of the contract company in the completion of a considerable part of the work undertaken by that company for the railroad company. How was it to be compensated for this use of its capital? What price was the contract company to pay for all the undertakings included in this rather unusual contract? This is answered by the contract. The concluding covenant is in these words:

"And said contract company agrees to pay the said construction company for said work, materials, and such claims as may be so purchased, the sum of $400,000, to be paid as follows: In the new 5 per cent. first mortgage bonds of said railroad company, the sum of $200,000 as soon as the bonds are printed and ready for delivery, and the sum of $200,000 in money due and payable at the expiration of thirty days after the track of said railroad is laid and completed as aforesaid from Richmond, Ky., to the Kentucky river, opposite Irvine, Ky., but should said sum not be paid at maturity, the same shall bear no interest until January 1, 1892."

Subsequently a modification of the contract was agreed upon, as follows:

"The agreement attached hereto between the undersigned, bearing date January ——, 1891, was made with the expectation and understanding that the paid-up capital stock of the Richmond & Irvine Construction Company should equal the sum of $200,000 in money which was to be expended in the prosecution of the work of constructing the R., N., I. & B. R. R. and the purchase of the lien claims mentioned in said contract. Now, this writing witnesseth, that if the said paid-up capital stock should fall short of the said $200,000, then the Richmond & Irvine Construction Company shall only be paid under said contract an amount of bonds equal to said paid-up capital stock, and a like amount in money. In testimony whereof, we have hereunto subscribed our names this, the 7th day of February, 1891."

The capital expended did in fact fall short of that anticipated, and the bond payment made by the contract company was correspondingly reduced. This agreement comes at last to this: that in place of agreeing, in the first instance, upon a definite price to be paid for what the construction company agreed to do and expend, the parties to that contract agreed that the price to be paid should be the actual amount of the cash expenditures plus the value of an equal amount of securities, which, as shown by the master's report, were worth 40 per cent. of their value. This arrangement settled definitely the profit allowed the construction company upon its entire outlay, provided the whole of the price should be paid or collectible. The contract may have been a hard bargain, as between the contracting corporations, and this view, in part, may account for the exceptional rule enforced in regard to the application of the partial payment so as to reduce the amount of its lienable claim, as well as the amount of its pro rata enforceable against the property of the railroad company. On the other hand, it is to be remembered, in mitigation, that this profit was more apparent than real. The market value of the

bonds rapidly depreciated after their delivery, and, when these suits were instituted, had declined to perhaps 15 per cent. of their par value. There was no probability of the payment of the cash part of the contract price, except through the enforcement of the statutory lien. The cost, delay, and uncertain result of a suit enforcing such a lien, as well as the uncertain and speculative value of the payment in bonds, were proper matters to be taken into consideration in fixing the gross price to be paid for all the construction company undertook to do and expend. The contract was one which did not affect the legal liability of the railroad company, nor did it subject its property to any larger lien than was already fastened upon it. It had an indirect effect due to the fact that the railroad company had already paid the contract company more than its ratable share in the original contract price, and so it indirectly affected the holders of the mortgage bonds, and of subcontractors' lien claims. But this indirect effect would result from any unwise subcontract made by the principal contractor. In the absence of intentional fraud, such indirect consequences are not matters of which the parties affected can complain. What the court was called upon to do was to ascertain the contract price due from the principal contractor to each subcontractor, eliminate from that so much of the price as was for work or expenditures nonlienable under the statute, and then ascertain the pro rata of the original contract price properly earned by each subcontractor. The mere hardness of the bargain between the principal contractor and its subcontractors, not amounting to a fraud upon other lienors or the railroad company, should have no effect in determining the pro rata of each subcontractor in the original contract price. The first direction in the decree, for an apportionment of the bond payment ratably between so much of the claim of the construction company as was entitled to the benefit of the statutory lien and that which was nonlienable, seems to be justified by the terms of the contract, and is therefore affirmed. In substance, that agreement was, that for each one dollar of money expended, the contract company would pay one dollar in money and one dollar in bonds. The bond payment must be treated as having been made ratably upon the lienable and nonlienable expenditures. But so much of the decree as directed that that part of the bond payment applicable to its lienable claim should be again prorated between that part of its lienable claim as was in excess of, and so much of it as was within its pro rata share of, the original contract price, was erroneous. We see no reason for applying that payment in any other manner than was adopted with reference to other subcontractors' liens.

3. The same appellant assigns as error that the court disallowed interest on its pro rata, except from the date of decree. We think this was error. The agreement between the contract company and the construction company provided that the actual cost of work and labor and expenditures for material, etc., made by the construction company for the contract company should be "payable at the expiration of thirty days after the track of said railroad is laid and completed as aforesaid from Richmond, Ky., to the Kentucky river, opposite Irvine, Ky.; and, should said sum not be paid at maturity, the

same shall bear no interest until January 1, 1892." We think this is an express contract for payment upon the completion of the work, and an implied promise to pay interest from and after January 1, 1892. Redfield v. Iron Co., 110 U. S. 176, 3 Sup. Ct. 570. Under this contract this appellant should have been allowed interest, in accordance with the terms of the contract, after January 1, 1892.

4. The contract between the construction company and the contract company provided for the doing of many things, and the expenditures of money on many accounts, which the circuit court held were not lienable matters. All these expenditures made by the construction company, and which were excluded from the lienable claim of that company, were made matters of exception to the report of the special master, and the ruling of the court thereon has been assigned as error. We are of opinion that the court's ruling was correct, with respect to each and all of these matters thus excluded from the lienable claim. Money paid for purchase of rights of way is neither work nor material, within the meaning of the lien act. Neither is money expended in the payment of the salaries of the president of the construction company and its other general officers, although properly chargeable to the contract company, as between it and the construction company. Nor were the expenses of the construction company for stationery, and like office material, lienable claims. The construction company paid $2,346.29 to a trust company to secure its guaranty upon a contract made by the construction company for the purchase of steel rails. Appellant insists that this expenditure constitutes a part of the actual cost of the steel rails which it had contracted to furnish for the completion of the road. We think that that expenditure was one resulting alone from its own want of sufficient cash capital, or its own insufficient credit, and that no such expenditure was within the meaning or spirit of the contract between it and the contract company. If its own capital or credit had been sufficient, no such expense need have been incurred; and the contract makes no provision, directly or indirectly, for compensating the construction company for expenses directly due to its own insufficient capital or credit. The construction company paid out some $10,000 for legal expenses incurred in purchasing or condemning rights of way. The court held such expenditures were not lienable. There was no error in this, for two reasons: First, because the furnishing of rights of way is not the furnishing of "materials," within the lien act; second, legal service rendered by counsel is not "labor," within the meaning of the lien statute.

5. Each of the appellants has filed numerous assignments of error touching the improper exclusion of items of expenditure which it is now insisted should have been included in ascertaining the total original contract price entitled to the statutory lien, and to be prorated among all who contributed to the proper work of construction. It is sufficient to say that we have given careful attention to the various assignments and the evidence relating to them upon which this class of objections to the decree have been presented to this court, and we find that none of the assign-

ments of error to the manner in which the original contract price was ascertained are well taken. The deduction from the gross contract price of a sum regarded as necessary on the evidence for the completion of the railroad seems to us to be well supported by the weight of proof. Error has been assigned because of an alleged erroneous deduction from the gross contract price on account of the agreement of the contract company to pay the interest upon the bonds of the railroad company during construction, and two installments after completion, of the road. We are of opinion that the ruling of the circuit court upon this point was correct. It was very essential to the contract company that the interest upon the bonds should be provided for during construction, and for such a period thereafter as it was reasonable to presume that the earnings of the road would be insufficient to pay. As the prospective owner of the bonds to be issued, it was directly interested in the maintenance of the credit of the railroad company. And so much of the contract as obligated the contract company to maintain the credit of the railroad company seems to have been based upon this obvious proposition. This agreement was not, in our judgment, at all dependent upon the operation of the road as completed by the Louisville Southern Railroad Company. It was an absolute contract to pay accruing interest for the time indicated, and formed a considerable element in the determination of the contract price. The interest unpaid was properly deducted from the contract price, and all the assignments of error relating thereto are overruled.

6. The decree allowed none of the subcontractors interest except from the date of the final decree. This has been assigned as error. We have already passed upon this matter, so far as the construction company is interested. The disallowance of interest seems to have been based upon the assumption that there was no contract between the contract company and the subcontractors for the payment of interest, and that the allowance of interest upon such claims, in the absence of a local statute, was within the sound discretion of the court. The court seemed also to attach importance to the fact that the litigation which has resulted in delay was not vexatious, but necessary for the proper marshaling of liens. The question divides itself: First, is interest properly allowable as between the contract company and its subcontractors? Second, is there any reason which should move the conscience of a chancellor to disallow interest because of its indirect effect upon the rights of another class of creditors? In general terms, it may be stated that the contracts between the contract company and its subcontractors provided for payments of a proportionate part of the contract price on monthly estimates as the work progressed, and for payment of all balances due on the completion of the work. There seems never to have been any serious controversy as to these balances due to subcontractors, except in regard to a claim for so-called extra work and materials asserted by appellant Walker. Their claims were not paid because the contract company was unable to pay them, and not because it disputed its liability. As between the contract company and the subcontractors, there can be no serious contention but that interest

should be paid from and after the completion of the work and the filing of their lien notices as required by statute.    That filing is the full equivalent of the rendition of a stated account.    In the case of Young v. Godbe, 15 Wall. 565, the court said with regard to the allowance of interest upon an open account that:

"If the debt ought to be paid at a particular time, and is not, owing to the default of the debtor, the creditor is entitled to interest from that time, by way of compensation for the delay in payment. And if the account be stated, as the evidence went to show was the case here, interest begins to run at once."

This rule announced by the supreme court of the United States seems to be in entire accord with the latest utterances of the supreme court of the state of Kentucky.    In the case of Henderson Cotton Manuf'g Co. v. Lowell Machine Shops, 86 Ky. 668, 7 S. W. 142, the court said, concerning the allowance of interest upon an account for machinery sold and payable at a definite time by agreement of the parties:

"The true ground upon which to put the allowance of interest is the fault of the party who is to pay the debt. If he has made default of payment, then, ex aequo et bono, he should reimburse the creditor for keeping him out of the use of his money. He should render an equivalent for the use of what is not his own. If there be a specified time for payment, and a failure to then pay, or a demand of payment of a liquidated claim, and default, then the debt should, as a matter of law, bear interest from the time of such failure. This is the current of authority, and it is supported by both right and reason."

Neither is there anything in the case of Redfield v. Iron Co., 110 U. S. 174, 3 Sup. Ct. 570, or Thomas v. Car Co., 149 U. S. 116, 13 Sup. Ct. 824, which conflicts with the doctrine as stated in Young v. Godbe and Henderson Cotton Manuf'g Co. v. Lowell Machine Shops, cited above.    In Redfield v. Iron Co., Justice Matthews, in discussing this question, said, for the court:

"Interest is given on money demands as damages for delay in payment, being just compensation to the plaintiff for a default on the part of his debtor. Where it is reserved expressly in the contract, or is implied by the nature of the promise, it becomes part of the debt, and is recoverable as of right; but, when it is given as damages, it is often matter of discretion. In cases like the present, of recoveries for excessive duties paid under protest, it was held in Erskine v. Van Arsdale, 15 Wall. 75, that the jury might add interest, the plaintiff ordinarily being entitled to it from the time of the illegal exaction. But where interest is recoverable, not as part of the contract, but by way of damages, if the plaintiff has been guilty of laches in unreasonably delaying the prosecution of his claim, it may be properly withheld. Bann v. Dalzell, 3 Car. & P. 376; Newell v. Keith, 11 Vt. 214; Express Co. v. Milton, 11 Bush, 49."

In Thomas v. Car Co., heretofore cited, there seems to have been no definite time agreed upon as to payment, and interest was disallowed because, as the court said, the delay in payment "was occasioned by resisting demands made by the car company, which the result of the litigation shows were excessive, if not extortionate." The contract company was in default, and interest is properly allowable from the time it failed to pay according to its promise, by way of compensation for the delay in payment.    Neither is there anything in the fact that the railroad company is insolvent, nor in the fact that the allowance of interest will diminish the fund to which

the bondholders may look for the payment of their bonds. The language relied upon in support of the decree disallowing interest, from the opinion in Thomas v. Car Co., that "as a general rule, after property of an insolvent passes into the hands of a receiver, or of an assignee in insolvency, interest is not allowable on the claims against the funds," was not a point upon which that case turned, and was doubtless intended to apply only to a case where the fund is insufficient to pay all, and the creditors are all of the same rank, as in the distribution of the assets of an insolvent bank, as in White v. Knox, 111 U. S. 784, 4 Sup. Ct. 686, and Bank v. Armstrong, 8 C. C. A. 155, 59 Fed. 372. This is not a case of the distribution of an insufficient fund among lienors of the same rank. The lien claims of the subcontractors are by the statute preferred over the mortgage, and the bondholders are entitled only to that which remains after senior liens are satisfied. If interest is properly due, as between creditor and debtor, the interest is just as much a part of the principal claim as the principal thereof. A like controversy arose in the case of Trust Co. v. Condon (decided by this court March 5, 1895, and not yet officially reported) 67 Fed. 84. There, as here, the contest was between subcontractors and mortgage creditors. The distinctions between the two cases is that, under the Tennessee statute construed in that case, the lien of the subcontractor was derived from, and subordinate to, the lien of the contractor, and his recovery against the property of the owner was limited to such sum as might be found due the principal contractor at the time the several subcontractors' liens accrued. The question in that case was as to the extent of the liability of the railroad property to the contractor. Judge Taft, who delivered the opinion of the court in that case, concerning these subcontractors' liens, said:

"They were liens superior to the bonds. They should bear interest, or, what is the same thing, the fund from which they are payable should bear interest until paid. The security and priority of the lien attach as well to interest as to principal. The aggregate of the subcontractors' claims exceeds by at least fifty per cent. the fund due Eager, even with interest, so that in the distribution no interest need be calculated on the claims after December 15, 1890, for the share applicable to each will not be varied by adding interest to all claims for the same period from December 15, 1890, to the date of the decree. But the limit in the aggregate of the liens fixed on the property must be increased by interest until satisfaction. This is not a case where the distribution is to be made pro rata between the lienholders and the bondholders, in which case, of course, interest is not to be calculated upon the claims after the time of the sequestration of the property for sale and distribution, so long as the claim cannot be paid in full. Bank v. Armstrong, 16 U. S. App. 465, 8 C. C. A. 155, 59 Fed. 372. In the distribution of the proceeds of a common security between liens of different priorities, we know of no principle by which interest can be stopped on the amount of the superior lien until its satisfaction. As between the bondholders and the lienholders, the lienholders are entitled to interest to the day of payment, and the decree should therefore include interest on the amount herein found due Eager from December 15, 1890, until it shall be entered."

One error assigned by appellant Walker and others needs to be especially noticed. J. W. Walker had a contract with the contract company for the erection of four bridges, for which he was to receive the sum of $146,200. One of these bridges was known as the

"Marble Creek Bridge," and its price was to be $37,000. During the erection of this bridge a large portion of it fell into a deep ravine, destroying or seriously damaging a large part of the material which had been placed in the incompleted structure. New material, of the value of $15,328.62, was furnished by Mr. Walker, and replaced in the bridge. The court declined to allow this claim, being of opinion that the loss should fall upon him, and not upon the contract company, nor upon the railroad company. The cause of the accident is unexplained. The employés of the bridge contractor were in the exclusive control of the work. The bridge fell, not from any violent storm, or by reason of any extraordinary natural cause. The clear inference is that it fell by reason of defective engineering; that it was insufficiently supported, or subjected by the bridge builders to some unnecessary strain. Appellant insists that he should be reimbursed for the new material: First. Because he alleges that the contract company agreed to reimburse him for the material destroyed by the falling of this bridge. We quite agree with the master and the district judge who tried this case, that appellant did not successfully sustain his contentions to an agreement to reimburse him for the new material necessitated by the falling of the bridge. Second. He insists that the title to the material damaged or destroyed was in the contract company, and that, therefore, it ought to sustain the loss. This contention is bottomed upon the fact that the agreement provided for the payment of the contract price in installments, as the material was delivered on the ground, less 10 per cent. of the value thereof. The contract concluded as follows:

"The balance of the contract price for each structure, including the ten per cent. reserved on the monthly estimates, is to become due and payable as each structure is completed and inspected and approved, according to both specifications attached hereto. As payments are made upon the material, the title to the same is to become vested pro rata in the party of the second part."

The proof fails to show that the material was in fact paid for as delivered, to any considerable extent. But we are of opinion, even if the material had been in part paid for, so that the title had vested in proportion to the payments in the contract company, that under the circumstances of this case the appellant ought not to be allowed to recover the value of this material, necessitated by an accident for which his own employés were manifestly responsible. The most he could claim, under any consideration, would be that each of the contracting parties should share the loss in the proportion that they held title to the material destroyed. The burden was certainly put upon appellant to establish the extent of his claim. This he has not done. But upon the ground first indicated, to wit, that the accident was the result of the negligence of the bridge contractor, and was not contributed to or brought about by any fault or neglect of the contract company whatever, the loss ought, therefore, to fall upon the party responsible for the accident.

The appeals of G. W. Gourley, W. B. Smith, C. F. & A. R. Durnan, J. W. Caperton, and John Bennett are from decrees disallowing

their claims as nonlienable under the statute. The appellants referred to rendered legal services in obtaining railroad rights of way under the contract of the construction company. We have already ruled that money expended in acquiring rights of way is not the subject of a lien under the statute. For the same reason, it must be held that legal or other services rendered to either the contractor or subcontractor in acquiring rights of way are not claims for "labor" done or furnished, within the meaning of the statute giving a "labor" lien. The decrees dismissing their intervening petitions must be affirmed.

J. E. Dougherty appeals because a claim for $454.10 for services as a civil engineer in the construction of the railroad was disallowed. The ground upon which it was disallowed was that his services were rendered within the counties of Jessamine and Woodford, and the claim filed in Jessamine county alone. The Kentucky act giving a lien for labor required that the verified statement claiming a lien should be filed in the county clerk's office of "each county in which the labor was performed." The only evidence concerning the locality in which Dougherty did his work is that during September, October, and November, 1890, "Dougherty's work was principally in Jessamine county, and his headquarters were in that county," and that "he did a small amount of work during that time in Woodford." The itemized statement of his account filed in Jessamine county was as follows:

Ohio Valley Improvement & Contract Co. to J. E. Dougherty, Dr.

1890.                                                Address...........
For services and expenses as resident engineer, as follows:

| | | |
|---|---|---|
| Salary for month of September | $100 | 00 |
| " " " October | 100 | 00 |
| " " " November | 100 | 00 |
| " " " December | 125 | 00 |
| " " " August | 13 | 20 |
| " " " September | 11 | 90 |
| " " " October | | 40 |
| " " " November | 2 | 10 |
| " " " December | 1 | 50 |
| | $454 | 10 |

It is clear that the greater part of his work during three months was done in Jessamine county, where his lien was filed. It will not be unjust if it be assumed that his salary of $300 during those months was two-thirds earned by his work in Jessamine, and that a proportionate part of his expenses for the same time attached to his work in Jessamine. The decree, as to his claim, will be so modified as to allow him $208.60, as the amount of his lien claim, upon which he will receive his pro rata as other lienors, with interest.

The claim of Dickason & Crawford was uncontested, except to the extent that it embraced railroad ties cut under a contract with the contract company, but never delivered to the railroad company, or on its premises. The contract company notified them that they would not accept the ties, and that they need not deliver them. The ties had been cut under and in accordance with a contract prior to such notice. There being no other market for them, they were

left to decay in the woods where cut.    The claim of appellants is that these ties were gotten out for this work, and were worthless for any other purpose, and that they are entitled to a lien, without regard to the fact that they were not actually used in the work of construction.    The case is a hard one, but it would be harder still to throw the loss upon the railroad company, which was in no default whatever.    If the material had been refused without good cause by the railroad company or its agents or assignees, appellants would have some standing under such cases as Howes v. Wire-Works Co., 46 Minn. 44, 48 N. W. 448.    So if they had been actually delivered on the premises of the railroad company, and not used, appellants would come within the principle of Burns v. Sewell, 48 Minn. 425, 51 N. W. 224, and Mechanics' Mill & Lumber Co. v. Denny Hotel Co. of Seattle (Wash.) 32 Pac. 1073.    The fault was wholly that of the contract company.    It breached its contract without reason, and refused to accept or pay for the material.    It never did go into the structure, and was never so delivered that the railroad acquired the title, or appellants parted with it.    Under such circumstances, we do not think appellants can be held as persons who have "furnished material," within the meaning of the lien act.

A considerable number of other errors have been assigned by one or other of the appellants.    To notice each would extend this opinion to an undue length.    They have all been examined, and none of them are regarded as pointing out any substantial error.    The decrees appealed from will therefore be affirmed, except as herein expressly modified.    Costs of appeal will be paid out of the fund arising from sale of the railroad.